

JUDGE KOELTL   09 CV   851

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**(ECF CASE)**

VERNON C. DAILEY, on behalf of himself and all others similarly situated,

               Plaintiff,

   vs.

BANK OF AMERICA CORP., WILLIAM BARNET, III, FRANK P. BRAMBLE, SR., JOHN T. COLLINS, GARY L. COUNTRYMAN, TOMMY R. FRANKS, CHARLES K. GIFFORD, KENNETH D. LEWIS, MONICA C. LOZANO, WALTER E. MASSEY, THOMAS J. MAY, PATRICIA E. MITCHELL, THOMAS M. RYAN, O. TEMPLE SLOAN, JR., MEREDITH R. SPANGLER, ROBERT L. TILLMAN, JACKIE M. WARD and STEVE TERRY,

               Defendants.

CA No.



RECEIVED
JAN 29 2009
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

      Plaintiff Vernon C. Dailey, a participant in the The Bank of America 401(k) Plan (the "Plan") covering substantially all employees of Bank of America Corporation and its subsidiaries (collectively "BOA" or the "Company"), individually and on behalf of all others similarly situated participants in and beneficiaries of the Plan (collectively, the "Participants"), alleges as follows:

## INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan's fiduciaries, including the Company's executives and its Board of Directors, on behalf of Participants in and beneficiaries of the Plan.

2.    Throughout the Class Period (January 11, 2008 to the present), the Plan invested in BOA common stock ("BOA stock") which was offered as one of the investment alternatives in the Plan.[1] As of December 31, 2007, the Plan held over $3 billion in BOA stock, which represented nearly 32% of the Plan's then-outstanding holdings.

3.    This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

4.    The Plan's fiduciaries knew or should have known that during the Class Period, BOA had made a series of material misrepresentations and omissions regarding: (1) the failure of BOA to adequately assess the merits of BOA's acquisition of both Countrywide Financial Corporation ("Countrywide") and Merrill Lynch Inc. ("Merrill Lynch") and the attendant dangerous exposure of BOA to toxic assets and obligations held by such entities, and (2) the inherent risk to BOA's financial health due to the complete lack of understanding of the extent to

---

[1]    According to its Form 10-Q filed on November 6, 2008, as of October 31, 2008, there were 5,017,579,321 shares of BOA stock outstanding.

which these acquisitions might harm the financial health of BOA. In other words, the Plan's fiduciaries knew or should have known that, as a result of the acquisition of these two toxic "black boxes," the financial health of BOA was in serious doubt and that allowing Plan Participants to continue to invest their retirement savings in BOA stock in the wake of these acquisitions was imprudent.

5. The Plan fiduciaries knew or should have known that the above material misrepresentations and omissions caused BOA common stock to trade at artificially inflated levels during the Class Period.

6. On January 11, 2008, BOA announced that it was acquiring Countrywide Financial Corporation for $4 Billion of BOA stock at an exchange ratio of 0.1822 shares of BOA stock for every share of Countrywide stock. This acquisition catapulted BOA from the fifth largest originator of mortgage loans and sixth largest servicer of mortgage loans to the top of both originating and servicing at a time when the housing market had already begun its downward spiral. This acquisition came less than 6 months after BOA invested $2 billion in Countrywide in August 2007 for only a 16% stake in the company, which investment was extinguished incident to the acquisition.

7. The impact of Countrywide's deteriorating condition on BOA's financial health was made clear from BOA's 3Q 2008 Form 10-Q for period ending September 30, 2008. The value of nonperforming consumer loans on BOA's balance sheet at the end of Q3 2008 was $11.8 billion compared to only $5.6 billion at the end of 2007 (before Countrywide was acquired), or an increase of more than double. Also in BOA's Q3 2008 Form 10-Q was the

disturbing revelation that it expected to receive only 75% of payments on loans it had acquired from Countrywide.

8. On September 15, 2008, BOA announced that it was acquiring Merrill Lynch for $50 billion worth of BOA stock after conducting only 48 hours of due diligence.

9. Unbeknownst to the public, in December 2008, accelerating losses at Merrill Lynch caused BOA to waiver on whether it would close the acquisition announced in September and that the United States Treasury and Federal Reserve Board were forced by BOA to pledge future assistance to BOA in exchange for its going forward with the transaction.

10. BOA's acquisition of Merrill Lynch closed on January 1, 2009.

11. On January 14, 2009, BOA shocked the market by announcing that BOA would be required to accept money from the federal government in exchange for preferred stock of the Company. On January 16, 2009 BOA explained that such investment would total $20 Billion and that the government also guaranteed to backstop future losses on $118 Billion in toxic assets, mainly from the Merrill Lynch portfolio. On January 16, 2009, BOA also issued its preliminary financial results for the fourth quarter and full year, 2008, disclosing an overall loss for the fourth quarter of $1.79 billion, led by a stunning $15.31 billion fourth quarter net loss at Merrill Lynch. Based on this new information, on January 20, 2009, analysts concluded that BOA would likely need to raise an additional $80 billion to restore its capital to adequate levels.

12. The need for such government funding was in stark contrast to Defendant Ken Lewis bluster on "60 Minutes" last October when he crowed to Leslie Stahl that BOA "didn't need" the $25 billion it then-recently accepted from the federal TARP program, which he characterized as a "patriotic" act.

13. These revelations caused the price of BOA stock to tumble, from a closing price of $10.20 per share on January 14, 2009 to close at $5.10 per share on January 20, 2009, a stunning 50% decline.

14. Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period as required by ERISA. Defendants breached their fiduciary duties owed to the Plan and the Participants under ERISA by, among other things:

- Selecting and maintaining BOA Stock as an investment alternative under the Plan and permitting the Plan to buy and hold shares of BOA common stock during the Class Period when it was an imprudent investment;

- Encouraging BOA's employees to invest in the BOA Stock;

- Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plan's investment in BOA Stock; and

- Failing to provide accurate, material information to Participants about the grave risks posed by BOA's reckless acquisitions of Countrywide and Merrill Lynch, and the attendant precarious state of BOA's financial health, necessary to enable Participants to make informed investment decisions concerning their contributions invested in the BOA Stock.

15. As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of hundreds of millions of dollars of the retirement savings and anticipated retirement income of the Plan's

Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

16. Because Plaintiff's claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as Participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

## JURISDICTION AND VENUE

17. **Subject Matter Jurisdiction.** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

18. **Personal Jurisdiction.** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them.

19. **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because at least one of the Defendants reside or maintain their primary place of business in this district and because a substantial amount of the acts alleged herein occurred in this district.

## PARTIES

**Plaintiff**

20.    Vernon C. Dailey ("Plaintiff") is a resident of Massachusetts. Plaintiff is a former BOA employee and is a participant in the Plan. During the Class Period, Plaintiff held an investment in BOA Stock in his individual Plan account.

**Defendants**

21.    Defendant BOA is a Delaware corporation with its principal executive offices located in Charlotte, North Carolina. At all relevant times, BOA operated as a bank holding company and financial holding company.

22.    According to the Form 5500 filed with the Department of Labor and the Internal Revenue Service for the 2007 fiscal year beginning January 1, 2007 and ending December 31, 2007 (the "Form 5500"), BOA is the Sponsor of the Plan.

23.    Defendant William Barnet, III ("Barnet") has been a director of BOA since April 2004 and is a member of the Audit Committee.

24.    Defendant Frank B. Bramble, Sr. ("Bramble") has been a director of BOA since January 2006 and is a member of the Asset Quality Committee.

25.    Defendant John T. Collins ("Collins") has been a director of BOA since April 2004 and is a member of the Audit Committee.

26.    Defendant Gary L. Countryman ("Countryman") has been a director of BOA since April 2004 and is a member of the Executive Committee.

27.    Defendant Tommy R. Franks ("Franks") has been a director of BOA since January 2006 and is a member of the Audit Committee.

28. Defendant Charles K. Gifford ("Gifford") has been a director of BOA since April 2004 and is a member of the Executive Committee.

29. Defendant Kenneth D. Lewis ("Lewis") at all relevant times has been the Chairman, Chief Executive Officer and President of BOA. He has been a director of BOA since 1999 and is a member of the Executive Committee.

30. Defendant Monica C. Lozano ("Lozano") has been a director of BOA since April 2002 and is a member of the Asset Quality Committee.

31. Defendant Walter E. Massey ("Massey") has been a director of BOA since 1998 and is a member of the Audit Committee.

32. Defendant Thomas J. May ("May") has been a director of BOA since April 2004 and is Chairman of the Audit Committee.

33. Defendant Patricia E. Mitchell ("Mitchell") has been a director of BOA since 2001 and is a member of the Compensation and Benefits and Corporate Governance Committee.

34. Defendant Thomas M. Ryan ("Ryan") has been a director of BOA since April 2004 and is chairman of the Corporate Governance Committee and a member of the Compensation and Benefits Committee.

35. Defendant O. Temple Sloan, Jr. ("Sloan") has been a director of BOA since 1996. He is the Corporation's Lead Director and is Chairman of the Compensation and Benefits and Executive Committees and a member of the Corporate Governance Committee.

36. Defendant Meredith R. Spangler ("Spangler") has been a director of BOA since 1988 and is a member of the Compensation and Benefits and Corporate Governance Committee.

37.     Defendant Robert L. Tillman ("Tillman") has been a director of BOA since April 2005 and is a member of the Asset Quality Committee.

38.     Defendant Jackie M. Ward ("Ward") has been a director of BOA since 1994.

39.     Defendants Barnett, Bramble, Collins, Countryman, Franks, Gifford, Lewis, Lozano, Massey, May, Mitchell, Sloan, Spangler, Tillman, and Ward are collectively referenced herein as the "Director Defendants."

40.     Defendants Mitchell, Ryan, Sloan, and Spangler are collectively referenced herein as the "Compensation and Benefits Committee Defendants."

41.     According to BOA's most recently filed Form 11-K, the Plan is administered by the Bank of America Corporation Corporate Benefits Committee ("Corporate Benefits Committee"). "John Does 1-10" consisted of various officers and employees of BOA, who managed the operation and administration of the Plan as members of the Corporate Benefits Committee. Because Plaintiff is currently unaware of the true identities and capacities of the members of the Corporate Benefits Committee, those individuals are named as "John Does 1-10." Plaintiff will substitute the real names of the Corporate Benefits Committee Defendants when they are known to Plaintiff.

42.     Upon information and belief, Defendant Steve Terry ("Terry") was one of the Company's executives responsible for administering the Plan. Defendant Terry signed the Form 5500 as the Plan administrator.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between January 11, 2008 to the present (the "Class Period") and whose accounts included investments in BOA Stock.

44.    Plaintiff meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

45.    ***Numerosity.***  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

46.    ***Commonality.***  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants acted as fiduciaries;

(b)    Whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's Participants and beneficiaries;

(c)    Whether Defendants violated ERISA; and

(d)     Whether the Plan suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(e)     What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants.

47.     **_Typicality._**  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution in vested benefits arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

48.     **_Adequacy._**  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

50.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the

Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

51.     The Plan is an "employee pension benefit plan" within the meaning §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §1002(2)(3) and 1002(2)(A).

52.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

53.     According to the 11-K, the Plan was established for the benefit of all employees of BOA and participating subsidiaries to offer those employees a means of savings funds, on a pretax basis or after-tax basis, for retirement.

54.     Full-time employees are eligible to participate in the Plan immediately upon hire.

55.     Plan participants may contribute between 1% and 30% compensation, up to the maximum allowable under Internal Revenue Code. These contributions to the Plan are allocated as directed by the participant.

56.     The Company's matching contribution is equal to the first 5% of plan-eligible compensation after completing 12 months of service. These contributions are allocated as directed by the participant.

57.     There are approximately 19 investment options under the Plan, one of which is BOA Stock. In fact, according to the Form 5500, approximately 32% of the Plan's total assets

were invested in BOA Stock. According to the Company's 11-K, as of December 31, 2007, the Plan held over $3 billion worth of BOA stock.

## DEFNDANTS' FIDUCIARY STATUS

### Plan Fiduciaries

58.     *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

59.     According to Form 11-K filed by BOA on June 6, 2008, the Plan is administered by the Corporate Benefits Committee, who are therefore named fiduciaries for purposes of ERISA.  The Form 11-K explains that the Board of Directors of BOA has the right at any time to remove any member of the Corporate Benefits Committee.  In addition, the Compensation and Benefits Committee of the Board is specifically tasked with overseeing the Corporate Benefits Committee.

60.     *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary

authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

61.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

62.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

63.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.


**BOA's Fiduciary Status**

64.     As the Plan Sponsor, Defendant BOA is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). As the Plan Sponsor, Defendant BOA had the responsibility of establishing investment options or alternatives in the Plan and reserved the right to change any investment alternatives, including the right to eliminate investment funds. Thus,

this responsibility also included the duty of monitoring the performance of the investment funds, including BOA Stock in the Plan. These are fiduciary functions under ERISA, pursuant to Department of Labor regulations. 29 C.F.R. § 2509.75-8 (D-4).

65.    BOA, at all applicable times, exercised control over the activities of its directors, officers, and employees, including control over their activities related to the Plan. Through the Board or otherwise, BOA had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, BOA had the authority and discretion to appoint, monitor, and remove individual directors, officers, and employees from their individual fiduciary roles with respect to the Plan. Accordingly, the actions of the Director Defendants, the Compensation and Benefits Committee Defendants and the Corporate Committee Defendants are imputed to BOA under principles of agency and the doctrine of *respondeat superior*, and BOA is liable for such actions.

66.    BOA also had the fiduciary duty to appoint, and hence had a duty to monitor and remove, the Trustee, and to execute the Trust documents with the Trustee to provide for the investment, management, and control of the Plan's assets.[2]

67.    Defendant BOA also acted as a fiduciary in connection with the dissemination of Plan communications made to the Plan's participants. BOA made direct representations to the Plan's participants relating specifically to the Plan's investment options, BOA's business and financial condition, and the merits of investing the Plan's assets in BOA Stock, and those representations were intended to communicate to Plan Participants information necessary for participants to manage their savings accounts under the Plan.

---

[2]    Bank of America, N.A. serves as the Plan trustee and record keeper.

68.     Upon information and belief, BOA was responsible for disseminating a Summary Plan Description ("SPD") for the Plan to Participants.  Upon information and belief, BOA was also responsible for disseminating to Participants the Plan's prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plan's various investment options. The Prospectus and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plan's assets allocated to their accounts.

69.     Upon information and belief, BOA's filings with the SEC, including but not limited to, annual reports, press releases, Forms 10-K, Forms 10-Q, and Registration Statements, were part of the SPD and the Prospectus.  BOA exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Plan participants information necessary for participants to manage their savings accounts under the Plan.

70.     Under ERISA, BOA was not required to cause the Plan to offer BOA Stock as an investment option under the Plan or to incorporate all of BOA's SEC filings into the Plan's documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

**Director Defendants' Fiduciary Status**

71.     According to the Company's Corporate Governance Guidelines, as adopted by the Board on December 9, 2008, the Board is the ultimate decision making body of BOA.  BOA's

business is conducted by its employees and officers under the direction of BOA's CEO, Defendant Lewis, and is subject to the oversight of the Board.

72.    Throughout the Class Period, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

73.    In addition, the Director Defendants were fiduciaries of the Plan because they issued Plan communications to Plan participants by signing SEC filings that are specifically incorporated into Plan documents. Indeed, all of the Director Defendants signed the Forms 10-K filed with the SEC during the relevant period on behalf of BOA in their capacities as directors. Defendant Kenneth D. Lewis (as Principal Executive Officer) also signed BOA's 10-Ks on behalf of BOA.

**Fiduciary Status of the Compensation and Benefits Committee Defendants**

74.    The Compensation and Benefits Committee Defendants were fiduciaries of the Plan under ERISA § (21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding appointment, removal and monitoring of the Corporate Benefits Committee, which was charged with the administration and management of the Plan and/or the Plan's assets, and possessed the full authority in their absolute discretion to determine all questions of eligibility for an entitlement to benefits under the Plan.

**Fiduciary Status of John Does 1-0**

75.     As members of the Corporate Benefits Committee charged with administering the Plan, Defendants John Does 1-10 are named fiduciaries of the Plan. As Plan Administrators, John Does 1-10 had discretionary authority and control to determine all matters relating to eligibility, coverage, and benefits under the Plan. They also had the responsibility for selecting, evaluating, monitoring, and altering the makeup of the investment alternatives provided under the Plan.

## FALSE AND MISLEADING STATEMENTS MADE TO PARTICIPANTS

76.     According to the Company's Corporate Governance Guidelines, "the Board relies on the honesty, integrity, business acumen and experience of the Company's management," in discharging its basic responsibility . . . to oversee the Company's businesses and affairs."

77.     Under BOA's Code of Ethics:

> [A]ll Associates have the responsibility to promote full, fair, accurate, timely and understandable disclosure in reports and documents that Bank of America files with or submits to the Securities and Exchange Commission and in other public communications made by the corporation.[3]

78.     Yet, throughout the Class Period, the Company disseminated a number of inaccurate statements regarding BOA's financial health, especially with respect to the negative effects of the Countrywide and Merrill Lynch requisitions.

79.     Many of the statements set forth below were made in Form 10-Ks and Form 10-Qs and the Schedule 14A Joint Proxy Statement filed on November 3, 2008 (the "Proxy

---

[3]     Each Senior Executive of BOA, including Defendant Lewis, was required to sign an acknowledgment form, stating that he/she has received a copy of the Code of Ethics, has read it, understands it, and agrees to comply with it.

Statement") that were signed by Defendant Lewis (as Principal Executive Officer). The Forms 10-Q and 10-K were certified by Defendant Lewis in accordance with the Sarbanes-Oxley Act of 2002, and were incorporated by reference into the Plan documents. By signing and certifying those particular Form 10-Qs and Form 10-Ks, Defendant Lewis represented, *inter alia*, that the quality and accuracy of the information contained therein concerning the Company's financial performance and condition was safeguarded by internal financial controls in place at the Company, which were designed to foster the development of reliable financial statements.

80.     The inaccurate statements made in Form 10-Ks that were also signed by the Director Defendants in their capacities as directors, in accordance with the Sarbanes-Oxley Act of 2002 and were incorporated by reference into the Plan documents.

**Countrywide Acquisition**

81.     Countrywide's balance sheet was in freefall by the time BOA announced the acquisition of the company in January 2008. As of December 31, 2007, its earnings had plummeted from approximately $2.6 billion in 2006 to over -$703 million, or a change of *negative* **126%**. This dramatic swing in Countrywide's fortunes was fueled mainly by its startling reversal in earnings of over $2 billion in 2006 in its mortgage banking segment to a loss of over $1.5 billion in 2007, or a negative 174% change year-over-year.

82.     Such extreme changes resulted from the fact that its total delinquency rate of mortgages had accelerated from 3.91% at the end of 2004 to 5% at the end of 2006 and then skyrocketed to almost 7% at the end of 2007. Because of this acceleration and the expectation that loan-to-value ratios would only increase given the continued deteriorating housing market at the end of 2007, Countrywide was forced to increase by **879%** its provision for credit losses

from approximately $335 million at the end of 2006 to a whopping $2.438 **billion** at the end of 2007.

83.     After the merger was announced, things only got worse for Countrywide. Its net earnings for Q1 2008 were approximately *negative* $900 million, which was an over *negative* 300% reversal from its earnings of approximately $434 million in Q1 2007. Its provision for loan losses related to its residential real estate lending had ballooned exponentially from approximately $152 million in Q1 2007 to over $1.5 **billion** in Q1 2008, or **987%**, and had increased from approximately $2.4 billion at the end of 2007 to over $3.35 billion at the end of Q1 2008, or approximately 40%.

84.     Countrywide's Q2 2008 performance was even more disturbing. It swung from net earnings of approximately $485 million in Q2 2007 to a loss of over $2.3 billion, or a decrease of over **580%**. This was nearly double the negative 300% change experienced in the previous quarter compared to the same quarter's performance in the previous year. Countrywide's provision for loan losses had swelled to over $5 billion across its businesses at the end of Q2 2008 as compared to only approximately $678 million at the end of Q2 2007, which represented an increase of over **737%**.

85.     If these glaring red flags weren't clear enough, in early May 2008 Standard & Poor's downgraded its rating for Countrywide bonds from BBB+ to BB+, a non-investment grade rating.

86.     Despite the knowledge of Countrywide's worsening outlook, the only mention of Countrywide in BOA's Q1 2008 Form 10-Q filed May 3, 2008 for the period ended March 31,

2008, was that BOA had announced the agreement to purchase Countrywide for $4 billion in BOA stock and that BOA had previously invested $2 billion in Countrywide in August 2007.

87. Instead, in a press release dated May 28, 2008 (filed with the SEC on May 29, 2008 on Form 8-K) concerning BOA's announcement of a new consumer banking structure to integrate BOA's and Countrywide's consumer banking business, Defendant Lewis enthused about how BOA was already the leader in deposits, debit cards and credit cards and that "[t]he Countrywide acquisition will create a leading position in home financing." Although the press release acknowledged "how critical the success of the Countrywide acquisition is to Bank of American," BOA did not bother to mention the accelerating losses in Countrywide's consumer mortgage business.

88. Similarly, in a July 1, 2008 announcement (filed with the SEC on the same day on Form 8-K) concerning the effectuation of the merger of BOA and Countrywide, BOA and Defendant Lewis saw fit only to highlight the cost savings and increased market share that would result from the acquisition. Defendant Lewis was quoted as saying: "This purchase significantly increases Bank of America's market share in consumer real estate, and as our companies combine, we believe Bank of America will benefit from excellent systems and a broad distribution network that will offer more ways to meet our customers' credit needs." Nowhere in BOA's press release was there any mention of the dire circumstances then present, nor the increasing downward drag that Countrywide would have on BOA's financial health.

**Merrill Lynch Acquisition**

89. All of these disturbing facts about Countrywide were known to Defendants at the time they were contemplating the acquisition of Merrill Lynch in mid-September 2008. Despite

the rising tide of losses at Countrywide, BOA decided after only 48 hours of due diligence over a weekend to purchase Merrill Lynch, which itself was weighed down by similarly toxic assets.

90.     Merrill Lynch describes itself as "one of the world's leading capital markets, advisory and wealth management companies with offices in 40 countries and territories and total client assets of approximately $1.5 trillion at September 26, 2008. As an investment bank, we are a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, and we serve as a strategic advisor to corporations, governments, institutions and individuals worldwide."

91.     Over the course of the last eighteen months, Merrill Lynch has reported net losses over six consecutive quarters. These losses were substantially attributable to declining values of trading assets held by Merrill Lynch as a principal in those transactions. The troubled assets include certain categories of asset-backed securities, including mortgage-backed securities, collateralized debt obligations (CDOs) and related derivative positions used as either hedges or investments in their own right.

92.     Other investment banks had experienced similar difficulties amidst illiquid market conditions and declining asset values. Most notably, in March 2008, Bear Stearns became effectively insolvent and was purchased by JPMorganChase in a deal arranged and backed by the U.S. Treasury Department and the Federal Reserve.

93.     During the week of September 8, 2008, the stock prices of many major financial services companies declined significantly as reports circulated regarding financial difficulties at Lehman Brothers Holdings, Inc. ("Lehman").

94.     On September 10, 2008, Lehman pre-announced a $3.9 billion net loss for its third quarter of 2008, as well as a number of initiatives to bolster its financial viability. Lehman's troubles were primarily associated with illiquid mortgage and real estate related securities. Despite Lehman's efforts to prevent insolvency, by September 12, 2008 it became clear that Lehman was running out of options and would likely file for bankruptcy.

95.     Given investors' perceptions of similar risks associated with Merrill Lynch's balance sheet, over the course of the week ending on September 12, 2008, Merrill Lynch's common stock price declined by $3.91 per share, or approximately 24 percent, to close at $12.59 per share on Friday, September 12, 2008.

96.     The Proxy Statement discloses that on the morning of Friday, September 12, 2008, the Merrill Lynch board of directors held an informational conference call during which senior management updated directors on recent market conditions, Lehman's waning financial viability, the status of Merrill Lynch's capital, liquidity and business results, Merrill Lynch's recent stock performance, and potential rating agency actions.

97.     During that conference call the Merrill Lynch board urged management to continue to evaluate the potential impact of market developments on Merrill Lynch and the possible courses of action Merrill Lynch might pursue in response to various possible scenarios. The Merrill Lynch board of directors stressed the need for Merrill Lynch to be prepared to act quickly as events unfolded.

98.     According to a September 19, 2009 article in The Wall Street Journal:

> [On September 13, 2008,] John Thain, then Chairman and Chief Executive Officer of Merrill Lynch was busy at the New York Fed working on Lehman's problems when a sudden realization hit him: If he didn't act fast, his own brokerage firm, Merrill, might not survive

this crisis. It occurred while listening to Lehman's president, Herbert H. "Bart" McDade III, give a sobering summary of Lehman's assets and liabilities. "This could be me by Friday," Mr. Thain thought, according to people who have spoken to him.

The stakes were high for Mr. Thain, a Goldman alum and former head of the New York Stock Exchange who had been Merrill's CEO only since December.

Over the past year, Merrill has written down more than $46 billion due to bad bets on real estate and other mortgage-related investments. Mr. Thain was brought in to clean up the mess. Still, Merrill's stock was getting hammered. It had fallen more than 12% on Friday alone. The 53-year-old Mr. Thain ducked out of his meeting, called Kenneth D. Lewis, the CEO of Bank of America Corp., and asked him if he'd be interested in buying Merrill.

99.     According to the same September 19, 2008, <u>Wall Street Journal</u> article:

Mr. Lewis didn't hesitate. Here was a chance for the Mississippi-born son of a soldier and night-shift nurse -- a man known among bankers for craving the respect of the Wall Street establishment -- to elevate Bank of America as rivals crumbled around him.

$$* \qquad * \qquad *$$

[B]y 2:30 that afternoon [on September 13, 2008], the two men were face to face in New York. The meeting set in motion a 36-hour marathon negotiating session.

100.     Based on news reports and the timing of the Merger, both Merrill Lynch and Bank of America moved quickly, in light of the apparently imminent bankruptcy of Lehman Brothers and deteriorating market conditions. By Sunday, September 14, 2008, only one day after the process began, Merrill Lynch and Bank of America had agreed on the principal terms of the Merger, providing for a stock-for-stock acquisition of Merrill Lynch at an exchange ratio of 0.895 shares of Bank of America for each Merrill Lynch share. As of September 14, 2008, the

implied value of the consideration to Merrill Lynch shareholders was $29 per share and Merrill

Lynch shareholders would own approximately 23% of the combined company.

101.    On September 15, 2008, Bank of America announced that it had agreed to acquire

Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that, according to BOA, "creates a

company unrivaled in its breadth of financial services and global reach." According to the BOA

press release:

> Bank of America Corporation today announced it has agreed to acquire
> Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that
> creates a company unrivalled in its breadth of financial services and
> global reach.
>
> "Acquiring one of the premier wealth management, capital markets,
> and advisory companies is a great opportunity for our shareholders,"
> Bank of America Chairman and Chief Executive Officer Ken Lewis
> said. "Together, our companies are more valuable because of the
> synergies in our businesses."

102.    During a conference call on September 15, 2008, Joe L. Price, Bank of America's

CFO stated, "[t]he price represents roughly 1.8x stated tangible book value. It's roughly 12x

Merrill Lynch's 2009 projects earnings based on First Call consensus estimates . . . we used First

Call consensus estimates as a base for modeling the transaction."

103.    Analysts on the call questioned the rationale for the deal price and suggested that

BOA may be overpaying for Merrill. Matthew O'Connor, an analyst at UBS, pointed out "there's

a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off

today and this week if the deal hadn't been announced. I guess the question is why pay $29 at this

point?"

104.    Defendant Lewis attempted to quell concerns by stating "the long term benefits were so overwhelming, it was such a strategic opportunity . . . we thought we had a compelling situation for the shareholders over the long-term."

105.    When another analyst asked about the necessary write-downs on Merrill's assets and if the numbers presented with the announcement include any mark-to-market write-downs, Defendant Lewis answered "The numbers that we presented today we have considered marks on the assets . . . I would tell you that, again, going back to the point of things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures. We are dealing with the same counterparties on things so again, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch has made."

106.    Analysts who studied the transaction also predicted the fact that Merrill Lynch could experience further asset write-downs and losses that would impair the value of the Merger. A Deutsche Bank analyst report, dated September 16, 2008, identified the potential risk of further write-downs at Merrill Lynch:

> The big question surrounding capital market businesses is, "how much more in write-downs are likely ahead?" In particular, a new weakness at AIG has the potential to hurt Merrill's capital via any potential insurance on its ABS CDO. Alternatively, additional selling of risky commercial or residential real estate assets could impact Merrill's commercial real estate securities ($18B), other risky mortgage assets ($3 1B; includes $10B alt-A, subprime and non-US residential), and leveraged finance ($8B), not withstanding declines in these amounts since the end of 2Q08. In additions to the "risky" assets, Merrill also has $33.7B in US prime mortgages on balance sheet... Moreover, it seems as though BAC had only 36 hours of due diligence, which does not give extra comfort in an environment when loss estimates seem to increase quarter after quarter. Indeed, several details were not included in the presentation, such as pro forma management, location, timeline (besides deal close in early 1Q09 and conversions sometime in 2010), etc. This by itself is

less the issue (we have confidence that BAC can work this out in a reasonable manner given proven success in previous integrations) vs. the bigger issues of comfort with the level of marks on MER's books. One way to think about the margin of safety for BAC is that its purchase price seems to give it room to incur $12 bil. of additional marks before the price is above MER's adjusted book value.

107.    In light of all the foregoing, in preparing the Proxy Statement, and the materials incorporated therein by reference, the Defendants were well aware of the severe, acute risks associated with the types of now illiquid assets accumulated by investment banks generally, and Merrill Lynch in particular, and had a due diligence obligation to ensure that disclosures to BOA shareholders with respect to Merrill Lynch's financial condition were accurate and complete.

**Merrill Lynch's October 16, 2008 Press Release**
**Announcing Third Quarter 2008 Financial Results**

108.    The Proxy Statement incorporated by reference several documents, including Merrill Lynch's filing on Form 8-K dated October 16, 2008. That filing included as Exhibits 99.1 and 99.2, respectively, Merrill Lynch's press release announcing its results for the Third Quarter of 2008 and a Preliminary Unaudited Earnings Summary for the Third Quarter.    The press release stated that Merrill Lynch reported:

> [A] net loss from continuing operations for the third quarter of 2008 of $5.1 billion, or $5.56 per diluted share, compared with a net loss from continuing operations of $2.4 billion, or $2.99 per diluted share, for the third quarter of 2007. Merrill Lynch's net loss for the third quarter of 2008 was $5.2 billion, or $5.58 per diluted share, compared with a net loss of $2.2 billion, or $2.82 per diluted share, for the year-ago quarter.

109. In its financial results, Merrill Lynch breaks out its revenue among several categories, including "principal transactions." In its November 4, 2008 Form 10-Q (discussed below), Merrill Lynch described "principal transactions":

> Principal transactions revenues include both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt. These instruments are recorded at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between marketplace participants. Gains and losses are recognized on a trade date basis.

110. In its third quarter 2008 press release Merrill Lynch reported negative $6.5 billion in principal transactions revenue, indicating a net loss due to realized or unrealized losses (either asset impairment write-downs or declines in mark-to-market valuations) in the securities held on its balance sheet.

111. Among the "significant items" driving third quarter revenues identified in the October 16, 2008 press release were write-downs and asset losses totaling $12.1 billion:

> - Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super-senior ABS CDOs(l) and the termination and potential settlement of related hedges with monoline guarantor counterparties.
>
> \*     \*     \*
>
> - Net write-downs of $3.8 billion, principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government-sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer.
>
> \*     \*     \*

- Net losses of $2.6 billion, resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures.

112.    In conjunction with its Third Quarter release, Merrill Lynch noted "Third Quarter and First Nine Months of 2008 Highlights," including, among others:

- Significant progress in balance sheet and risk reduction; RWA declined by approximately 15 percent over the quarter; and

- Reductions of 98 percent of U.S. Alt-A residential mortgage net exposures. Including planned sales, reductions of 56 percent in non-U.S. residential mortgages and 25 percent in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio.

113.    The October 16, 2008 Press Release, included a quote from Defendant John Thain where he stated that, "[w]e continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal. As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth."

**Merrill Lynch's Third Quarter 2008 Form 10-Q**

114.    On November 4, 2008, Merrill Lynch filed its quarterly report on Form 10-Q for the third quarter of 2008 (ended September 26, 2008) with the SEC. The Proxy Statement, at pg. 124, specifically incorporated by reference "additional documents that either company files with the SEC" including "Quarterly Reports on Form 10-Q and Current Reports on Form 8-K."

115.    Merrill Lynch's November 4, 2008 Form 10-Q substantially incorporated the financial results and financial information quoted above from the October 16, 2006 8-K/Press

Release and represented that the financial disclosures in the 10-Q complied with generally accepted accounting principles (GAAP).

116. The Form 10-Q disclosed that Merrill Lynch had total assets of $875.8 billion, which included the following asset categories, totaling $ 261.5 billion, that were substantially subject to the losses and write-downs announced in the fourth-quarter of 2008 (discussed below):

| Asset Category | | Value in Millions, as of September 26, 2008 |
|---|---|---|
| **Trading assets**, at fair value (includes securities pledged as collateral that can be sold or repledged of $27,074 in 2008), including: | | 189,358 |
| Derivative contracts | 74,106 | |
| Equities and convertible debentures | 34,311 | |
| Corporate debt and preferred stock | 38,998 | |
| Mortgages, mortgage-backed, and asset-backed | 19,130 | |
| Non-U.S. governments and agencies | 8,998 | |
| U.S. Government and agencies | 6,903 | |
| Municipals, money markets and physical commodities | 6,912 | |
| Investment Securities (includes $4,045 in 2008 and $4,685 in 2007 measured at fair value in accordance with SFAS No. 159) (includes securities pledged as collateral that can be sold or repledged of $7,152 in 2008 and $16,124 in 2007) | | 72,182 |
| **Total** | | **$261,540** |

## The October 31, 2008 Joint Proxy Statement

117. In addition to those statements detailed above, which were explicitly incorporated by reference into the Proxy Statement, on or about October 31, 2008 the parties jointly issued the Proxy Statement. As detailed below, the Proxy Statement misstated and failed to inform BOA shareholders of material facts concerning Merrill Lynch's business, true financial condition and the substantial risks associated with Merrill Lynch's assets. The cover letter enclosing the Proxy Statement was signed by Defendant Lewis.

118.    The Proxy Statement identified twelve distinct "Risk Factors," at pages 23 through 26, and stated that "stockholders should consider the matters described below in determining whether to adopt the merger agreement." None of the Risk Factors identified provided disclosure concerning the specific risk that Merrill Lynch's assets were too complex and illiquid to value with any degree of specificity and that there was a substantial risk that the true value of those assets were substantially less than the stated value, impairing the value of the Merrill Lynch acquisition to BOA shareholders.

119.    Under the heading "Recent Developments" the Proxy Statement disclosed that BOA had agreed to sell $15 billion in preferred stock to the U.S. Treasury pursuant to the Capital Purchase Program ("CPP") that was effectuated after Congress passed the Emergency Economic Stabilization Act of 2008:

> On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury has the authority to, among other things, invest in financial institutions and purchase mortgages, mortgage-backed securities and certain other financial instruments from financial institutions, in an aggregate amount up to $700 billion, for the purpose of stabilizing and providing liquidity to the U.S. financial markets. On October 14, 2008, the U.S. Treasury announced a plan, referred to as the Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate. In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of

preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28,2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under"-Merrill Lynch & Co Developments - Unaudited - Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

120.    The Proxy Statement similarly disclosed that at the present time Merrill Lynch would not

participate in the CPP, pending the outcome of the Merger:

After discussions with Treasury and Bank of America, Merrill Lynch has determined that, in view of the pending merger with Bank of America, it will not sell securities to the U.S. Treasury under the CPP at this time, but may do so in the future under certain circumstances. As a result, Merrill Lynch has entered into a purchase agreement that provides for delayed settlement for a sale of $10 billion of a new series of Merrill Lynch preferred stock and warrants to purchase 64,991,334 shares of Merrill Lynch Common Stock at an exercise price of $23.08 per share. The agreement provides that the closing will take place on the earlier of (i) the second business day following termination of the Merger Agreement with Bank of America and (ii) a date during the period beginning on January 2, 2009 and ending on January 31, 2009 if the Merger Agreement is still in effect but the merger has not been completed by the specified date, but, in the case of either (i) or (ii), in no event later than January 31, 2009. In addition, prior to January 2, 2009, if the Merger Agreement is still in effect but the merger is not been completed, Merrill Lynch has the right, after consultation with the Federal Reserve and Bank of America, to request that the U.S. Treasury consummate the CPP investment on or prior to January 1, 2009. The Purchase Agreement will terminate at 12:01 am on February 1, 2009 if the investment has not been made by that date.

Completion of the CPP investment prior to the termination of the Merger Agreement is subject to Bank of America's approval. Bank

of America has agreed it will not unreasonably withhold or delay its consent. After January 1, 2009, Bank of America may not withhold its consent if, after consulting with Bank of America, Merrill Lynch reasonably determines that the failure to obtain the CPP investment would have a material adverse impact on Merrill Lynch. After January 30, 2009 until 12:01 a.m. on February 1, 2009, Merrill Lynch will have the unilateral right to obtain the CPP investment and Bank of America has consented in advance to the investment at such time if the merger has not been completed at that date.

\*      \*      \*

On October 29, 2008, Merrill Lynch and Bank of America, N.A., a wholly owned subsidiary of Bank of America, entered into a $ 10 billion committed unsecured bank revolving credit facility with borrowings guaranteed under the Temporary Liquidity Guarantee Program. This facility will be available to Merrill Lynch until January 3 0, 2009 but may expire at an earlier date if the merger with Bank of America is terminated or consummated prior to January 30, 2009 or Merrill Lynch elects to participate in the CPP. If Merrill Lynch participates in the CPP, the proceeds received from the U.S. Treasury will be used to repay in full any outstanding amounts owed under this facility.

121.    The Proxy Statement contained statements from both companies highlighting the potential benefits of the Merger. BOA articulated numerous "Reasons for the Merger" and included the "Recommendation of the Bank of America Board of Directors," which stated the following at 54-55:

**Bank of America's Reasons for the Merger;**
**Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors consulted with Bank of America management as well as financial and legal advisors and determined that the merger is in the best interests of Bank of America and Bank of America stockholders. In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following material factors:

• its understanding of Bank of America's business, operations, financial condition, earnings and prospects and of Merrill Lynch's business, operations, financial condition, earnings and prospects;

\*     \*     \*

• the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

• the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

• the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America.

122. In describing the Representations and Warranties made by Merrill Lynch and BOA, the Proxy Statement assured investors that these included determinations that no "material adverse effect" has occurred between the date of the Merger Agreement and the date of the closing of the Merger (emphasis added):

The merger agreement contains customary representations and warranties of Merrill Lynch and Bank of America relating to their respective businesses. With the exception of certain representations that must be true and correct in all material respects (or, in the case of specific representations and warranties regarding the capitalization of Merrill Lynch, true and correct except to a de minimis extent), no representation or warranty will be deemed untrue, inaccurate or incorrect as a consequence of-the existence or

absence of any fact, circumstance or event unless that fact, circumstance or event, individually or when taken together with all other facts, circumstances or events, has had or would reasonably be expected to have a material adverse effect on the company making the representation.

*     *     *

Each of Bank of America and Merrill Lynch has made representations and warranties to the other regarding, among other things:

*     *     *

• capitalization;

*     *     *

• financial statements, internal controls and accounting or auditing practices;

*     *     *

• the absence of material adverse changes;

*     *     *

In addition, Merrill Lynch has made other representations and warranties about itself to Bank of America as to:

investment securities and commodities;

123.    The Merger Agreement, annexed to the Proxy Statement as Appendix A, included the following language in paragraph 3.8, the definition of "Material Adverse Effect," the occurrence of which would allow for the termination of the Merger :

> 3.8 Absence of Certain Changes or Events. (a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term" Material Adverse Effect" means, with respect to Parent or Company, as the case may be, a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole (provided, however, that, with respect to clause (i), a "Material

Adverse Effect" shall not be deemed to include effects to the extent resulting from (A) changes, after the date hereof, in GAAP or regulatory accounting requirements applicable generally to companies in the industries in which such party and its Subsidiaries operate, (B) changes, after the date hereof, in laws, rules, regulations or the interpretation of laws, rules or regulations by Governmental Authorities of general applicability to companies in the industries in which such party and its Subsidiaries operate, (C) actions or omissions taken with the prior written consent of the other party or expressly required by this Agreement, (D) changes in global, national or regional political conditions (including acts of terrorism or war) or general business, economic or market conditions, including changes generally in prevailing interest rates, currency exchange rates, credit markets and price levels or trading volumes in the United States or foreign securities markets, in each case generally affecting the industries in which such party or its Subsidiaries operate and including changes to any previously correctly applied asset marks resulting therefrom, (E) the execution of this Agreement or the public disclosure of this Agreement or the transactions contemplated hereby, including acts of competitors or losses of employees to the extent resulting therefrom, (F) failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof or (G) changes in the trading price of a party's common stock, in and of itself, but not including any underlying causes, except, with respect to clauses (A), (B) and (D), to the extent that the effects of such change are disproportionately adverse to the financial condition, results of operations or business of such party and its Subsidiaries, taken as a whole, as compared to other companies in the industry in which such party and its Subsidiaries operate) or (ii) the ability of such party to timely consummate the transactions contemplated by this Agreement.

124. During a special meeting on December 5, 2008, BOA shareholders approved the acquisition of Merrill Lynch by authorizing the shares of common stock to be issued in the merger.

125. Despite the fact that BOA shareholders did not vote on the Merger until December 5, 2008, after over two-thirds of the fourth quarter had passed, the Proxy Statement was not updated, corrected, amended or supplemented with any information

concerning the actual losses incurred by Merrill Lynch during the fourth quarter of 2008, or the risk that such losses could occur and would materially effect the value of BOA if the Merger were consummated, given the nature of the assets and the lack of or inability of BOA to perform adequate due diligence to value the assets. Nor was the Proxy Statement updated or corrected to reflect that owing to losses incurred by Merrill Lynch during the fourth quarter of 2008, BOA would be required to seek additional funding from the United States Treasury Department.

126. The foregoing statements contained in or incorporated by reference into the Proxy Statement:

a. misstated Merrill Lynch's financial results and financial position, including by overstating the assets recorded on Merrill Lynch's balance sheet as of the third quarter of 2008;

b. misstated the benefits of the Merger, including the value of the assets to be acquired from Merrill Lynch;

c. misstated, in John Thain's statements in the October 16, 2008 press release, that Merrill Lynch continued to "reduce exposures and de-leverage the balance sheet";

d. omitted to disclose that Merrill Lynch's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse effect;

e. omitted information about the magnitude and impact of losses incurred by Merrill Lynch during the fourth quarter of 2008; and

f.     misstated and omitted to disclose information concerning the potential risks of acquiring Merrill Lynch and the potential for further material write-downs, impairments and losses on assets held by Merrill Lynch.

127.    Defendants knew or should have known that, given the above misstatements and/or omissions, coupled with the disastrous result of the Countrywide merger, BOA Stock was an imprudent Plan investment. During the Class Period, as Directors and members of committees entrusted with the stewardship of the Plan, Defendants ignored several serious, non-public red flags that should have alerted them to the fact that BOA Stock was not a prudent investment for the Plan.

128.    The Plan fiduciaries also knew or should have known that the above material misstatements and omissions caused BOA common stock to trade at artificially inflated levels during the Class Period.

## THE TRUTH IS REVEALED

129.    Events and disclosures that occurred after the December 5, 2008 vote on the Merger have revealed the following, none of which was disclosed to BOA shareholders:

a.    Merrill Lynch would record a massive $ 15 billion loss in the fourth quarter of 2008, its largest loss in any of past six quarters of consecutive losses, attributable mostly to losses incurred on assets held for trading and recorded as negative revenue under "principal transactions";

b.    This loss was sufficient to trigger the "material adverse effect" clause in the Merger Agreement, allowing BOA to terminate the Merger; and

c.    That the Defendants knew of these facts and pursued additional funding under the CPP in order to complete the Merger.

130.     Despite his knowledge of Merrill Lynch's staggering losses, and without revealing them to shareholders, Lewis forged ahead with the deal. On January 1, 2009, BOA completed its purchase of Merrill Lynch.   Defendant Lewis was still positive on the closing of the merger, stating, "[w]e are now uniquely positioned to win market share and expand our leadership position in new markets around the world."

131.     On Thursday, January 15, 2009, The Wall Street Journal reported that BOA would receive additional funding under the CPP and that such funding was sought earlier in December by Defendant Lewis. The article also reported that the massive fourth quarter losses at Merrill Lynch necessitated this additional funding:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion in committed federal rescue funds, said that it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.
>
> Treasury, concerned the deal's failure could affect the stability of U.S. financial markets, agreed to work with the Charlotte, N.C., lender on the "formulation of a plan" that includes new capital from the $700 billion Troubled Asset Relief Program, according to the person familiar with the talks. The amount and terms are still being finalized, this person said. Details are expected to be announced with Bank of America's fourth-quarter earnings, due out Tuesday.
>
> Any possible arrangement might protect Bank of America from losses on Merrill's bad assets. There would be a cap on the amount of losses the bank would have to absorb, with the federal government being on the hook for the remainder, said one person

familiar with the matter. Both the Federal Reserve and the Federal Deposit Insurance Corp., alongside the Treasury, are involved in the negotiations, say people familiar with them.

*　　*　　*

Bank of America is expected by some analysts to report a loss for the fourth quarter, or at least a smaller profit than expected. It is not known exactly how much Merrill lost in the same time period. Merrill's problems largely stem from the deterioration of assets on its books and trading losses, said a person familiar with the matter.

*　　*　　*

The deal between Bank of America and Merrill was forged during the hectic weekend last September that saw Lehman Brothers Holdings Inc. collapse and giant insurer American International Group Inc. start to unravel. Merrill Chief Executive John Thain, worried his firm would be next, pressed for a quick deal.

In the aftermath of Bank of America's acquisition of Merrill -- valued at $50 billion when it was announced and worth $19.36 billion when it closed -- its chief executive, Kenneth D. Lewis, was viewed as a savior of the financial-services industry, having rescued both Merrill and Countrywide without government assistance.

132.    The New York Times also reported on January 15, 2009, that Defendants Lewis

sent lawyers to New York in December to explore BOA's ability to terminate the Merger since

Merrill Lynch's losses during the fourth quarter of 2008 constituted a material adverse effect.

133.    The January 15, 2009 *The New York Times* article confirmed that Defendant

Lewis had learned of the losses, analyzed them and then scheduled a meeting for December 17,

2008, a mere twelve days after the Merger vote, with government officials to discuss the impact

of the losses. The article also reported that prior to that December 17, 2008 meeting with

Treasury officials, Defendant Lewis had a telephone call with Federal Reserve Chairman

Bernanke to discuss Merrill Lynch's fourth quarter losses. *The New York Times* reported that at

the December 17, 2008 meeting Defendant Lewis sought additional funds from the government and told Treasury officials that Merrill Lynch's fourth quarter losses put the Merger in "jeopardy":

> The preparations for further support come after Bank of America's chief executive, Kenneth D. Lewis, told regulators in mid-December that the shotgun deal it signed just two months earlier with Merrill Lynch was in jeopardy.
>
> Billions of dollars in write-downs on mortgages, commercial real estate and other credit assets at the brokerage firm climbed into double-digit territory in the fourth quarter, pushing Merrill into a substantial loss, said a person who spoke anonymously because they were not authorized to disclose the information. Fearing their own capital base could not support Merrill's flagging assets, executives at Bank of America told regulators they would need assistance in order to close the deal by their target date of Jan. 1.
>
> *       *       *
>
> At one point in December, Mr. Lewis even sent lawyers to New York to find out whether Merrill's situation amounted to a material-adverse situation that might allow the bank to cancel the deal, according to a person familiar with the situation.
>
> As Mr. Lewis was learning at the time, Merrill was suffering losses in the fourth quarter on a host of credit-related products, say people familiar with the company's results. While Merrill Lynch Chief Executive John Thain and Tom Montag, the firm's global head of sales and trading, positioned these losses as significant in various meetings with management, they described the losses as "market related" and not out of step with the rest of Wall Street, according to attendees at these meetings.
>
> Mr. Thain often stressed the losses were from so-called legacy positions and not new ones taken on by Mr. Montag, according to these people. Total Merrill losses could total in excess of $ 10 billion, say people familiar with the matter.
>
> *       *       *

By Dec. 17, Mr. Lewis went to Washington to discuss what he had already disclosed to Mr. Bernanke in an earlier phone call — that his bank was having trouble digesting Merrill's losses. Mr. Lewis described the losses as monstrous, according to a person familiar with the matter.

At that 6 p.m. meeting, Mr. Bernanke and Mr. Paulson both told Mr. Lewis that failing to complete the Merrill acquisition would be disastrous. The policy makers said abandoning the deal would further destabilize markets, and would hurt the bank, potentially setting off a ripple effect that would exacerbate a fragile situation.

Messrs. Bernanke and Paulson also urged Mr. Lewis to finish the deal and not invoke a material-adverse change clause, saying it was in his interest to finish the deal. If they walked away,- it would reflect poorly on the bank and suggest it hadn't done its due diligence and wasn't following through on its commitments.

The policy makers told Mr. Lewis that if conditions were really as bad as he believed, then the government could step in with a rescue similar to that used for Citigroup Inc. in November. In such an arrangement, the government would provide cash and guarantee against part of the firm's losses.

In addition to a capital injection from the Treasury, the Fed, Treasury and FDIC are working on an asset-guarantee plan modeled after the Citi rescue. The government may backstop a figure of $ 115 billion to $ 120 billion in Bank of America assets, with BofA agreeing to take a portion of first losses, the Treasury and FDIC taking second losses, and the Fed backstopping a large chunk of the rest.

The Treasury rescue deal could be announced alongside the bank's earnings, which have been moved up to a Friday release.

"Bank of America didn't do proper due diligence," said Bradley Dorman, managing partner at WhaleRock Point Partners, a Providence, R.I., investment adviser with 315,000 shares in the bank. He said Mr. Lewis "probably jumped the gun."

"There was a tremendous lack of transparency," added John Moore Sr., who controls 18,000 shares and lives in Charlotte, where is chairman of commercial real-estate firm Moore Cos. "As a shareholder, without disclosure and transparency it is extremely difficult to make a reasonable investment decision."

134.   Following the reports of the need to obtain additional CPP funding in light of losses at Merrill Lynch, BOA shares declined by $1.88 each, or 18.4%, to close on January 15, 2009, at $8.32.

135.   News reports on January 16, 2009, continued to reflect the impact of the deterioration of Merrill Lynch's financial condition. On January 16, 2009, *The Wall Street Journal* reported on the CPP funding to be received by BOA, including a $20 billion investment in preferred stock and "insurance" on $118 billion in assets. The article also noted that the current market value of the combined BOA/Merrill Lynch was less than BOA's stand alone market value prior to the announcement of the Merger, implying that the market viewed Merrill Lynch as having negative value:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan.
>
> Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991, and set off a new round of debate in Congress about the scope and mission of the Treasury's financial-system bailouts.
>
> Thursday's 18% stock-market drop gives the Charlotte, N.C., bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill. Its shares have lost over 40% of their value in the past seven trading sessions.
>
> The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

136.     In addition to the article above, the "Heard on the Street" column in the January

16, 2009, *Wall Street Journal* includes the following commentary on the Merger:

> Bank of America shareholders who voted for the Merrill Lynch purchase must be feeling a mix of emotions right now. Among them: anger.
>
> On Dec. 5, holders voted for the deal, which was initially announced during September's Lehman Brothers crisis.
>
> On the day of the vote, Chief Executive Kenneth Lewis said BofA would have "the premier financial-services franchise."
>
> When the deal closed Jan. 1, Mr. Lewis was still positive, saying:
>
> "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."
>
> What shareholders weren't told: From mid-December, BofA executives were discussing with the Treasury possible extra aid to support the Merrill deal.
>
> Since Merrill was going to be a big part of BofA, and since government aid often hurts the interests of common shareholders, investors can feel aggrieved that they weren't told what was going on behind the scenes.
>
> *          *          *
>
> BofA's acquisition of Merrill looked over-priced from the start. And Mr. Lewis has said he wasn't pressured by the government into acquiring Merrill or Countrywide. While institutions were bailed out for mistakes made before the credit crunch hit, BofA looks set to be rescued from overambitious deals once it was in full-swing.

137.     A January 16, 2009 article in The New York Times provided additional detail

about the deal with Treasury and further confirmed that BOA considered the fourth

quarter losses at Merrill Lynch sufficient to invoke the "material adverse effect" clause in the

Merger Agreement:

Two weeks after closing its purchase of Merrill Lynch at the urging of federal regulators, the government cemented a deal at midnight Thursday to supply Bank of America with a fresh $20 billion capital injection and absorb as much as $98.2 billion in losses on toxic assets, according to people involved in the transaction.

The bank had been pressing the government for help after it was surprised to learn that Merrill would be taking a fourth-quarter write-down of $15 billion to $20 billion, according to two people who have been briefed on the situation, in addition to Bank of America's rising consumer loan losses.

\*     \*     \*

Even before the most recent deal with Merrill closed, troubles began to surface. At the time, shareholders liked the strategic fit of adding Merrill Lynch, the nation's biggest brokerage firm, to the nation's biggest bank. Still, they worried that Mr. Lewis had paid a hefty premium -- or underestimated Merrill's losses -- in the merger stitched together over the mid-September weekend that Lehman Brothers filed for bankruptcy.

When the deal was announced, Mr. Lewis said that he had considered buying Merrill months earlier but was not comfortable with its mortgage exposure. John A. Thain, the chief executive of Merrill Lynch, said he had cleaned up much of his company's problems. "We have been consistently cleaning up the balance sheet, repairing the damage that was done over the last few years," Mr. Thain said.

Mr. Lewis praised Mr. Thain for decreasing risks at the firm and said that Merrill's capital levels were in good shape.

As it turned out, more problems were lurking. In December, when executives at Merrill began tallying losses on its mortgage investments, they were found to exceed previous estimates. The write-downs will total between $15 billion and $20 billion, possibly its largest ever, according to two people who have been briefed on the situation, and include mortgage assets, commercial real estate and other credit investments.

When it notified Bank of America of such gaping write-downs, the bank became fearful it would not have the capital to cover them. The

revelations, which came just weeks before the merger was expected to close, prompted Bank of America to ask the government for additional help.

Shortly before Christmas, Bank of America told regulators that it might walk away from Merrill because of mounting losses at the brokerage. But the regulators, concerned Merrill might founder, urged Mr. Lewis to press ahead. Given the severity of the situation, government officials said they needed to take immediate action to avert a systemic risk. The officials agreed to another capital infusion and said they would guarantee assets belonging to both companies.

138.    Notwithstanding the evident stress to the financial condition of BOA (and Merrill Lynch) and the impact on the Merger, Defendants kept material developments, including Merrill Lynch's massive fourth-quarter losses and write-downs, from shareholders until January 16, 2009.

139.    Before the opening of the financial markets on January 16, 2009, BOA reported its financial results for fiscal 2008 and the fourth quarter of 2008. BOA's press release also included information concerning Merrill Lynch's preliminary fourth quarter 2008 financial results.

140.    BOA's January 16, 2009, press release disclosed Merrill Lynch's fourth quarter 2008 results:

Merrill Lynch preliminary results indicate a fourth-quarter net loss of $15.31 billion, or $9.62 per diluted share, driven by severe capital markets dislocations. (See the Transition Update section of this news release and supplemental earnings information provided on http://investor.bankofamerica.com for further details.).

In view of the continuing severe conditions in the markets and economy, the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate.
In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure, primarily from the former Merrill Lynch portfolio. Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses.

Bank of America would pay a premium of 3.4 percent of those assets for this program.

*    *    *

Transition Update

Merrill Lynch was acquired on January 1, 2009 creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities.

Merrill Lynch preliminary results indicate a fourth-quarter net loss of $ 15.31 billion, or $9.62 per diluted share, driven by severe capital markets dislocations.

Merrill Lynch's Global Wealth Management division generated $2.6 billion in net revenue in the period as fees held up well in the declining markets. The strongest performance came from the U.S. Advisory portion of the business. Retention of financial advisors remains consistent with historical trends.

Significant negative fourth-quarter items for Merrill Lynch include:

-- Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion.

-- Goodwill impairments of $2.31 billion.

-- Leveraged loan writedowns of $ 1.92 billion.

-- $1.16 billion in the U.S. Bank Investment Securities Portfolio writedowns.

-- Commercial real estate writedowns of $1.13 billion.

141.    In Exhibit B to the Fourth Quarter 2008 Supplemental Information, made available by BOA on January 16, 2009, BOA disclosed that during the fourth quarter of 2008, Merrill Lynch had net negative revenue attributable to "principal transactions" of $13.1 billion and an additional $3.4 billion in net losses under "Other" which

included "losses on investment securities, private equity investments, loans and other miscellaneous items."

142.  Following BOA's January 16, 2008 announcement, the price per share of BOA's common stock dropped further from its prior close of $8.32 per share, to close on January 16, 2009 at $7.18 per share, a decline of 14%. The cumulative decline on both January 15 and January 16, 2009, from the January 14, 2009 closing price of $10.20 per share, totaling $3.02, or 31%.

143.  The extent of the losses incurred at Merrill Lynch during the fourth quarter is staggering. Even in the context of Merrill Lynch's previous write-downs and losses over the past six quarters, the loss attributable to "principal transactions" is greater than in any of the prior quarters, as follows:

| | 2007 | | 2008 | | | |
| | 3rd Q | 4th Q | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|---|---|
| Principal Transactions Revenue (Loss) (millions) | ($5,930) | ($12,596) | ($2,418) | ($4,083) | ($6,573) | ($13,109) |

144.  The news reports following BOA's disclosure of the $15 billion loss at Merrill Lynch raised further question as to the accuracy and completeness of the disclosures provided to BOA shareholders. A January 17, 2009, article in The New York Times. highlighted the question of when Merrill Lynch's losses became known to Defendants:

> "The question is, When did Merrill Lynch know they had these losses? A lot of times companies would disclose losses of that magnitude," said Michael Mayo, an analyst at Deutsche Bank. "This was dramatic."

> Mr. Lewis told analysts that he was surprised to learn in December, three months after the bank snapped up Merrill Lynch in a shotgun deal, that the magnitude of losses at the brokerage was far greater than expected. He said he had considered walking away from the deal

at that point, but was persuaded not to, partly by regulators who feared that a failure to seal the deal could set off a new round of panic in the markets.

The decision to stick with Merrill despite its problems, he said, was patriotic. "I do think we were doing the right thing for the country," Mr. Lewis said.

But that may not be the right thing for the bank's shareholders, who were already upset that Mr. Lewis appeared to have overpaid to achieve his dream of dominating the brokerage business In the months after the merger, however, financial markets deteriorated more brutally. The bank's shareholders voted on the merger on Dec. 5. And while the full extent of Merrill's fourth-quarter losses might not have been fully known then, had shareholders had an idea of the extent of the losses, they may have agitated for the deal price to be renegotiated.

Mr. Lewis said he had considered trying to renegotiate the price once he learned the extent of Merrill's losses. But he feared that the length of time required for a new shareholder vote would put Merrill and the markets at risk. More important, he said, the government did not want to risk new turbulence in financial markets if the deal were to be delayed.

*     *     *

But Stuart Plesser, a banking analyst with Standard & Poor's Equity Research, said that by his estimates, Bank of America would not have needed the additional government capital without Merrill's problems. He said the bank could have cut its dividend in half to cover its capital needs. The situation, he said, "doesn't seem to be a good deal for shareholders at all."

Also unanswered was why Bank of America explained only about $9 billion of Merrill's write-downs. There are also write-downs of at least $4 billion in Merrill's fixed-income unit. Those marks could be related to trades that were put on in recent months. A spokesman for Bank of America declined to comment.

145.    Similarly, a January 17, 2009 article in The Wall Street Journal raised questions about

the disclosures related to the Merger:

- 49 -

Executives at both Bank of America and Merrill have indicated the losses at Merrill ballooned in mid December, leading to a meeting between Mr. Lewis and Treasury Secretary Henry Paulson on Dec. 17. However, the market for various credit-related products began to deteriorate in mid-November, leaving many Merrill Lynch insiders to ask what Merrill CEO John Thain knew, and when.

Merrill lost $15.3 billion during the period, and the run-up in losses was concentrated in the firm's sales and trading department, run by Tom Montag, who was hired by Mr. Thain in 2008 to run that division. The two frequently told the firm's other top managers that the losses, while significant, were largely connected to so-called legacy positions at Merrill and the losses were "market-related" and not out of step with the rest of Wall Street, according to attendees at these meetings.
Friday, some top executives and members of Merrill's board questioned privately why they weren't told about the magnitude of the losses or that the deal was possibly in jeopardy. Mr. Thain declined to comment on whether he knew about the Dec. 17 meeting between Messrs. Paulson and Lewis.

Merrill incurred large losses during the fourth quarter from derivative trades with thinly capitalized bond-insurance companies whose financial health deteriorated considerably last year. Many of the derivative contracts were written to cover periods of more than 20 years, which meant the bond insurers wouldn't be on the hook for significant cash payouts for years.

146.   Throughout the Class Period, the price of the Company's stock was artificially

inflated as a direct result of the above statements concerning the Company's financial condition

and results. Had BOA revealed the truth about the Company's financial condition and results to

the investment community, the price of BOA stock that the Plan purchased on behalf of Plaintiff

and other Participants would have been at substantially lower prices. Moreover, had Defendants

fulfilled their fiduciary duties respecting the Plan, Defendants would have ceased offering BOA

stock as an investment option at the beginning of the Class Period due to the inherently and

dangerously precarious financial situation BOA put itself in by acquiring what had become "ticking time bomb" companies like Countrywide and Merrill Lynch.

**Defendants Knew Or Should Have Known That BOA
Stock Was Not A Prudent Investment For The Plan**

147.     At all relevant times, Defendants knew or should have known that BOA was on precarious financial footing as a result of the acquisitions of Countrywide and Merrill Lynch detailed above, which made BOA Stock an imprudent investment for the Plan.

148.     Defendants failed properly to take into account the rushed and imprudent acquisitions of Countrywide and Merrill Lynch, which put BOA Stock at extreme risk, when determining the prudence of investing and holding the Plan's assets in Company Stock.

149.     As a result of BOA's and Director Defendants' direct knowledge of, and implication in, creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's Participants regarding the Plan's investment in Company Stock did not sufficiently and effectively inform Participants of the present and future dangers of investing in Company Stock.

150.     In addition, Defendants failed to adequately review the performance of the other fiduciary Defendants to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

151.     Defendants also failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's Participants with information regarding BOA's precarious situation so that Participants could make informed decisions regarding Company Stock in the Plan.

152.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in BOA Stock, under these circumstances, was clearly imprudent. A prudent

fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary loss, and would have made different investment decisions. Because Defendants knew or should have known that BOA Stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in BOA Stock.

153. Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of BOA Stock; discontinuing further contributions to and/or investment in BOA Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; and/or resigning as fiduciaries of the Plan.

154. Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses as a result of the Plan's investment in BOA Stock. In fact, the Defendants continued to invest and allow investment of the Plan's assets in Company Stock even as BOA's deteriorating financial health in the wake of the Countrywide and Merrill Lynch acquisitions came to light.

**Defendants Regularly Communicated with the Plan's
Participants Concerning Purchases of BOA Stock, Yet Failed to
Disclose the Imprudence of Investment in BOA Stock**

155. Defendants regularly communicated with employees, including the Plan's Participants, about BOA's performance, future financial and business prospects, and BOA Stock. During the Class Period, the Company fostered a positive attitude toward BOA Stock as an investment for the Plan, and/or allowed the Plan's Participants to follow their natural bias towards investment in the stock of their employer by not disclosing negative material information concerning investment in BOA Stock. As such, the Plan's

- 52 -

Participants could not appreciate the true risks presented by investments in BOA Stock and therefore could not make informed decisions regarding investments in the Plan.

## The Law Under ERISA

156.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

157.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

158.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

159.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in BOA Stock, to ensure that each investment is a suitable option for the Plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

160.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

161.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

162.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1).  According to Form 11-K filed by BOA on June 8, 2008, the Plan is administered by the Corporate Benefits Committee, the members of which are therefore named fiduciaries for purposes of ERISA.

163.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, the Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

164.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in BOA Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

165.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not

to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

166.    Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

167.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

168.    As alleged above, BOA, as well as the Director Defendants, the Compensation and Benefits Committee Defendants and the Corporate Benefits Committee Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

169.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants, particularly the Compensation and Benefits Committee and Corporate Benefits Committee Defendants, were responsible for ensuring that all investments in BOA Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

170.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan Participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan Participants or beneficiaries, nor may it allow others, including those whom they direct or whom are directed by the plan, including plan trustees, to do so.

171.     BOA, Director Defendants, Compensation and Benefits Committee and Corporate Benefits Committee Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that as a result of the Company's failure to adequately appreciated the vast downside risk to BOA posed by the Countrywide and Merrill Lynch acquisitions, BOA Stock was not a suitable and appropriate investment for the Plan as described herein.  Investment in BOA Stock during the Class Period clearly did not serve the Plan's purposes of helping Participants save for retirement, and in fact caused significant losses/depreciation to Participants' savings.  Nevertheless, these fiduciaries continued to offer and approve the BOA Stock as an investment option for the Plan.  In so doing, these Defendants further breached their fiduciary duties.

172.     Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in BOA Stock and the Company's matching contributions in BOA Stock.  Further, given that nearly 32% of the assets of the Plan was invested in the stock of a single company – BOA --, Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.  All categories of Defendants failed to implement any such strategy.

173. Moreover, the Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling the Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

174. Director Defendants had actual or constructive knowledge of BOA's failure to properly evaluate the toxic assets held by Countrywide and Merrill Lynch and of how such failure would materially adversely affect the financial performance of the Company and the share price of the Company's stock which was an asset held in trust by them in the Plan.

175. Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of BOA Stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in BOA Stock, despite inarguably having knowledge of such breaches.

176. Furthermore, through their own failure to prudently and loyally manage the Plan's investment in BOA Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in BOA Stock.

177. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their

investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)

178.　Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

179.　At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

180.　As alleged above, the scope of the Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and assets of the Plan. In addition, the Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

181.　The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in BOA Stock.

182.     Because a substantial percentage of the Plan's assets were invested in BOA Stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

183.     Specifically, BOA, through its officers and directors, including Director Defendants and Plan Committee Defendants, issued a multitude of false and misleading statements through SEC filings and press releases regarding value of BOA Stock and the financial health of the Company. Defendants further made material omissions in these communications by failing to disclose adequate information about the Company's failure to properly investigate and value the toxic assets held by Countywide and Merrill Lynch prior to BOA's requisition of them, or the negative effects of that failure on BOA's financial health and stock price.

184.     Upon information and belief, such communications were disseminated directly to all Participants, including the Prospectuses which incorporated by reference the Company's materially misleading and inaccurate SEC filings, proxies and reports furnished by BOA, through its Director Defendants. In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in BOA Stock in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding BOA Stock as required by ERISA.

185.     In addition, the Executive Defendants, the Compensation and Benefits Committee and the Corporate Benefits Committee were responsible for providing Participants in the Plan with investment education and communication. These Defendants, however, failed to disclose any information to Plan Participants regarding BOA's precarious financial situation caused by the acquisitions of Countywide and Merrill Lynch both of which held staggering amounts of assets that could not be reasonably and prudently

valued, which adversely affected Company stock as a prudent investment option under the Plan. The Executive Defendants, the Compensation and Benefits Committee and the Corporate Benefits Committee thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

186. The Executive Defendants, the Compensation and Benefits Committee and the Corporate Benefits Committee also breached their fiduciary duty by failing to "prepare and furnish to Participants all information required under federal law or provisions of the Plan." These Defendants neglected to furnish Participants with complete and accurate information regarding BOA's highly questionable financial health and the losses caused to the BOA stock fund contained in the Plan.

187. The Defendants named in this Count breached their duty to inform Participants by failing to provide complete and accurate information regarding BOA Stock and, generally, by conveying inaccurate information regarding the soundness of BOA Stock and the prudence of investing retirement contributions in the Company's stock.

188. These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in BOA Stock during the Class Period and, thus, the stock's precipitous decline had a material impact on the value of Participants' retirement assets.

189. In addition, BOA and the other Defendants named in this Count knew or should have known that information they possessed regarding the true condition of BOA would have an extreme impact on the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

190. As a consequence of the failure of the Defendants named in this Count to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices

regarding investment of their retirement savings in BOA Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, BOA Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

191.   As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost a significant portion of their retirement savings.

192.   Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.


## COUNT III

**Failure to Monitor Appointed Plan Fiduciaries and Provide Them with Accurate
Information (Breaches of Fiduciary Duties in Violation of ERISA § 404
by BOA and Director Defendants and Compensation and Benefits Committee Defendants)**

193.   Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

194.   At all relevant times, as alleged above, BOA, the Director Defendants, and Compensation and Benefits Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A). At all relevant times, as alleged above, the scope of the fiduciary responsibilities of BOA, the Director Defendants and Compensation and Benefits Committee Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. The monitoring fiduciaries, BOA, the Director Defendants and Compensation and Benefits Committee Defendants, had the duty to:

      (a)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

      (b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

      (c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

      (d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

      (e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

      (f)    Ensure that the appointed Plan fiduciaries report regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

195.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and

must take prompt and effective action to protect the plan and Participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

196.    BOA and the other defendants named in this Count breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made the Company's Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance.

197.    Specifically, BOA, through its Board of Directors and the Compensation and Benefits Committee thereof, is responsible for appointing various executives and employees to administer the Plan. Since BOA and Director Defendants had direct knowledge of BOA's fundamental lack of understanding of the risks inherent in the Countrywide and Merrill Lynch acquisitions alleged above, they had a fiduciary duty to inform such executives and employees of these practices so that they could manage and administer the Plan with full knowledge of BOA's overall financial strength and with full appreciation for Company stock as either a prudent or risky investment under the Plan. By remaining silent and continuing to conceal this information about BOA's financial condition from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

198.     BOA and the other defendants named in this Count also breached this duty by not properly

disclosing information, which they knew or should have known, about the Company's ignorance

concerning the assets and obligations of Countrywide and Merrill Lynch to the Trustee.  The Trustee is

responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be

subject to the direction and guidance of BOA, the Director Defendants, the Compensation and Benefits

Committee Defendants and Corporate Benefits Committee Defendants.  The Corporate Benefits Committee

in particular is responsible for providing the Trustee with general investment policy guidelines and

directions to assist the Trustee respecting investments made in compliance with, and pursuant to, the terms

of the Plan.  The Trustee cannot manage investments and oversee that they are made in the best interest of

Participants, as required under the Plan and under ERISA, if the Trustee is not provided with material

information regarding BOA's financial condition and the risks in maintaining large investments in BOA

common stock.  These Defendants therefore breached their duty to inform the appointed Trustee.

199.     BOA, the Director Defendants and the Compensation and Benefits Committee Defendants

knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently

allowing the Plan to continue offering BOA Stock as an investment alternative for the Plan, and (b)

continuing to invest the assets of the Plan in BOA Stock when it no longer was prudent to do so.  Despite

this knowledge, BOA, the Director Defendants and the Compensation and Benefits Committee Defendants

failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of

these fiduciaries' failures.

200.     BOA, the Director Defendants and the Compensation and Benefits Committee Defendants

are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as

those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

201. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

202. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of**
**ERISA §§ 404 and 405 by All Defendants)**

203. Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

204. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

205. ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

206. Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries. These conflicts of interest put these Defendants in

the inherently problematic position of having to choose between their own interests as directors, officers, executives (and BOA Stockholders), and the interests of the Plan's Participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

207.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in BOA Stock; failing to disclose the corporate malfeasance or its negative impact on Company stock as a prudent investment under the Plan; failing to notify appropriate federal agencies of the facts which made BOA Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

208.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA § 405 by All Defendants)

209.     Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

210.     ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to

conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

211.    As alleged herein, BOA, through its officers and employees, such as Defendant Lewis and the Corporate Benefits Committee Defendants withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, BOA and the other Defendants named in this Count participated in, knew or should have known about the Company's misrepresentations concerning its adherence to federal regulations and the financial health of the Company. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of BOA Stock as an investment for the Participants' retirement assets.

212.    Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of BOA Stock during the Class Period. They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in BOA Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in BOA Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

213.     In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying the significance of BOA's problems and further concealing such practices from Participants and the market as a whole.

214.     In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants – including any appointed Plan fiduciaries – who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's knowingly negligent practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in BOA Stock.  In so doing, these Defendants breached ERISA § 405(a)(1)(B).

215.     Further, through their failure to properly and effectively monitor their appointees or remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed Plan fiduciaries' imprudent management of the BOA Stock in the Plan.

216.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

217.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. '1l09(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Knowing Participation in a Breach of Fiduciary Duty
### (Breaches of Fiduciary Duties in Violation of
### ERISA §§ 404 and 502(a)(3) by BOA)

218.     Plaintiff incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

219.     To the extent that BOA is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, BOA knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

220.     BOA benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing BOA Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of BOA providing the market with materially misleading statements and omissions.   Accordingly, BOA may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of BOA Stock which would have been contributed to the Plan, but for BOA's participation in the foregoing breaches of fiduciary duty.

### CAUSATION

221.     The Plan suffered losses in plan benefits because substantial assets of the Plan – to wit, over $3 billion -- were imprudently invested or allowed to be invested by Defendants in BOA Stock during the Class Period, in breach of Defendants' fiduciary duties.   These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

222.     Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in BOA Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in BOA Stock, and Defendants remain liable under ERISA for losses caused by such investment.

223.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in BOA Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of BOA Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

224.     Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

225.     The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in BOA Stock during the Class Period. As a consequence of the Defendants' breaches, the Plan suffered significant losses.

226.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil

action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who

is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan

any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court

may deem appropriate . . . ."

227.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a

presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would

not have made or maintained their investments in the challenged investment and, where alternative

investments were available, that the investments made or maintained in the challenged investment would

have instead been made in the most profitable alternative investment available. In this way, the remedy

restores the values of the Plan's assets to what they would have been if the Plan had been, properly

administered.

228.     Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (a)

a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches

of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above,

as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to

remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a)

and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. §

1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these

amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

229.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the

Plan.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

230.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment decisions. In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

231.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, the Defendants did exactly the opposite. As a consequence, Participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in BOA Stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

232.    Specifically, Defendants failed to disclose to Participants that BOA failed to conduct adequate due diligence concerning the acquisitions of Countrywide and Merrill Lynch and/or failed to disclose that it could not reasonably value the assets and liabilities of these companies, which materially affected the financial health of the Company. By omitting this information from SEC filings and other communications to Participants, Defendants misrepresented the Company's true financial condition and the true value of shares in Company Stock as a Plan investment. Without being given this information, Plan Participants did not have any informed control over decisions to invest in Company stock under the Plan.

233.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plan, the Plaintiff and the Class for relief stemming from Participants' decisions to invest contributions in BOA Stock

is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

234. Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants. Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for:

A. A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B. A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.	An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.	An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in BOA Stock;

G.	Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.	An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.	An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.	An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: January 29, 2009

**HARWOOD FEFFER LLP**

By: _Robert I. Harwood_
Robert I. Harwood
Peter W. Overs, Jr.
488 Madison Avenue, 8th Floor
New York, NY 10022
(212) 935-7400
(212) 753-3630

Major Kahn
**MAJOR KAHN, LLC**
20 Bellevue Street
Weehawken, NJ 07086
(646) 546-5664
(646) 546-5755

*Counsel for Plaintiff*